# JOHN KINGHAM *v.* HONOLULU RAPID TRANSIT AND LAND COMPANY.

### EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

ARGUED MAY 17, 1906.        DECIDED JUNE 22, 1906.

### FREAR, C.J., HARTWELL AND WILDER, JJ.

EXCEPTION—*error in striking out evidence—party excepting, not being wholly blameless, granted new trial on condition of paying costs to date.*

In an action for injuries caused by an ejectment from a street car, the plaintiff having given testimony from which the jury might have found that his inability to work thereafter was due either to such injuries or to an affliction unconnected therewith, it was error to strike out the testimony in regard to such affliction; and the defendant, not being entirely free from blame in the part it took in the immediate proceedings out of which the error arose, while held not estopped from taking advantage of the error, is granted a new trial only on condition of paying all costs to date.

### OPINION OF THE COURT BY FREAR, C.J.

This is an action for damages resulting from an ejectment of the plaintiff from an electric street car of the defendant cor-

poration by the conductor of the car. The case comes here on twenty-six exceptions, most of which are overruled without further comment as abandoned or founded on harmless errors or on correct rulings. The only exceptions that call for serious consideration are those which raise the question as to whether the verdict, which was for the plaintiff in the sum of $5000, was excessive, and whether the defendant can now have the benefit of an exception to the striking out of certain evidence in regard to an affliction of the plaintiff's right arm called peripheral neuritis. This evidence bore upon the question whether the plaintiff was obliged to give up his employment because of the injuries received from the accident or because of the peripheral neuritis as an independent cause and so bore upon the question as to the extent or permanency of the injuries resulting from the accident alone.

The jury might have found the following from the evidence: The plaintiff, a widower, living alone, sixty-one years of age, with an expectation of life of $13\frac{1}{2}$ years, had worked at the Honolulu Iron Works five or six years, during the last three of which he had been afflicted with asthma, which had caused him to lose considerable time; his wages were $4.25 a day; on May 7, 1905, he boarded the defendant's car on King street in Honolulu going towards Waikiki at the corner of Punchbowl street and when crossing the marsh from King street to Waikiki road was seized with an attack of asthma which caused him to leave the car when it reached the Waikiki road, with a view to walking off the asthma; he walked back towards town on the Waikiki road until he was near the junction of that road with King street, when he heard a car coming on King street and ran to catch it, but finding that it was going in the wrong direction he walked on King street to the first station towards town and there boarded the first car going towards town, which happened to be the same car on its return trip on which he had gone out; he was then very much choked up with the asthma, which was made worse by his running for the car; after riding a short distance the conductor came and asked him to "Dig up, old man;" plaintiff told him to stop a minute or two because

he was sick; the conductor then said, "Old man, if you wont dig up when I come back I will throw you off the car. This is the second station you have rode without paying," and then went forward and soon after returned; the plaintiff was then standing up holding on to the back of the seat in front of him with one hand and trying to get his money out of his hip pocket with the other hand, there being more than $30 in the pocket and the pocket having a flap with a button, which made it difficult to get the money out; the plaintiff then said to the conductor "You wouldn't throw a man off the car, would you, put your hand in my pocket and take a nickel out," whereupon the conductor said, "I wont, would I," and stamped on the plaintiff's left foot and with his hands pushed the plaintiff off "just like a flash" when the car was in motion just speeding up after having stopped at what is called the Neumann switch, which was not over three minutes' run from where the plaintiff boarded the car; the plaintiff struck the edge of the stone curbing of the sidewalk, which was only a few feet from the car track, on the small of his back and cried so with pain as not only to cause the employees and passengers in the car to turn around but to cause persons in houses on the opposite side of the street to come out to the man; the motorman upon hearing the cry stopped the car, but was ordered by the conductor to go ahead, which he did; the persons from the opposite houses found the plaintiff lying with the small of his back on the edge of the curbing, his feet towards the track and his head on the sidewalk, in great pain and in a semi-conscious condition and lifted him on to the sidewalk, bathed his face with a wet towel and called an ambulance, in which he was taken to the hospital; there he was put on the operating table, stripped and examined, when there were found a bruise extending from near the ankle upwards about two inches, but which was superficial and not of a serious nature, and a reddish contusion or welt in a straight line from six to eight inches in length and about an inch and a quarter in width extending across the back from a little to the right of the spine towards the left; the examination at that time

was not very thorough owing to the great pain which the plaintiff suffered when he was touched in the region of the welt, but a day or two afterwards it was discovered that the eleventh rib was broken about three inches to the left of the spine; the plaintiff remained in the hospital five weeks, during which time he suffered much pain, which was greatly increased by the coughing due to the asthma; he spat blood frequently during that time; after leaving the hospital he was not able to resume work until about the middle of October; then when at work he grew worse and finally was obliged to stop working about the middle of December and had not been able to work after that up to the time of the trial, which was five or six weeks later; he had paid $45 on account of his hospital bill of $52.50.

The defendant contended among other things that the plaintiff was intoxicated on the day of the accident and had used vile and abusive language to the motorman and conductor on the out trip and to the conductor on the return trip, that he declined to pay his fare, that the conversation between him and the conductor on the return trip was not as represented by the plaintiff, that he was removed from the car without violence and making no resistance and when the car was not in motion, that after he was safely on his feet upon the ground he staggered and fell, that there was no spitting of blood, and that the injuries were not of a serious nature. The jury must have disbelieved more or less of the testimony offered by the defendant and accepted as true that for the plaintiff, where they differed.

Whether the verdict was excessive or not, it is unnecessary to decide, for if it had been left to the jury to say how far leaving the iron works was due to the peripheral neuritis and how far to the injuries resulting from the accident and if they had found, as they might have found in such case, that it was due wholly or mainly to the peripheral neuritis, they might have rendered a verdict for a materially less amount; and therefore if, as we hold, the trial judge erred in striking out the evidence as to peripheral neuritis and the defendant can now take advantage of that error, the verdict must be set aside and a new trial

ordered, irrespective of the amount of the verdict that was rendered.

There can be no doubt that it was error to strike out the evidence. A mere statement of the evidence as to why the plaintiff left the iron works, coupled with the plaintiff's concession that the accident was not the proximate cause of the neuritis is sufficient to show that the jury might properly have found, if the evidence as to the neuritis had been left in, that leaving the iron works was due to the neuritis, while with that evidence struck out the jury had practically no alternative to finding that leaving the iron works was due to the weakness of the back and the increase of asthma resulting from the accident. This evidence is in the main as follows as given by the plaintiff himself. It will be given in narrative form.

On direct examination: "I began to work there (at the iron works in October) and I still began getting worse. In December as compared with the way I was before, I couldn't work at all. My tools dropped out of my hand and I couldn't pick my work up or twist it around to do anything. I am a machinist, it is necessary to lift heavy weights all the time. It is all heavy work, the heaviest work I ever did in my life. I couldn't follow my situation up whatever. I had to leave it. Before I received these injuries I was all right aside from the asthma. As to the present condition of my back, it hurts me so that I can't pick nothing up. I tried. Actually when I get down on the floor I can't get up hardly. I have not been able to do any more or other work since I knocked off in December. My arm is very bad. The asthma comes on me much more quicker than it used to do. Also my back has been very bad, just the same, and this—afflicted with my arm." Transcript, pp. 17, 18, 20, 21.

On cross examination: "About the middle of December the trouble with my arm came on me, when I left work. Dr. Judd has treated me for that. On the day I knocked off work, when the tools fell out of my hand I tried to pick them up two or three times and use them and I couldn't. My arm began to pain first up by my elbow and it gradually got down to my fingers, just like a complete numb, and I thought my arm'd bursted it seemed so big, so as I couldn't hold my arm up. I was obliged to swing it in that way [showing] to get relief from

pain, and then I went up to Dr. Judd and got him to look at it and he is treating it today for the same thing. I can't use my arm at all. The pain has been something terrible up to this last week every day. I walked the floor for three nights and on Sunday morning at about 8 o'clock I did manage to lay down and get a good sleep. The pain was that great it was just like my arm was going to burst, and since it has gone away, except what is in my fingers, the end of my fingers. Sometimes I begin to tremble and I can't hold myself still. I try but I can't do it. If I begin to talk and stand up sometimes it comes on me very rapidly and other times it will be stopped for a little while. Right from my elbow down to the ends of my fingers. From the elbow it goes to my bone but it goes down. I have had it in my bones so I could hardly move from pain." Transcript, pp. 35-38.

The defendant contends that striking out all evidence as to the arm not only precluded him from submitting to the jury whether that was not the sole or principal cause of the plaintiff's leaving the iron works but also from introducing experts, of whom he claims to have had two present for the purpose, to show that peripheral neuritis was unconnected with the accident and was due to excessive use of intoxicating liquor, but it is unnecessary to consider the latter branch of the argument, especially in view of the fact that it was conceded that the neuritis was not caused by the accident.

The question of chief difficulty is whether, prejudicial error having been made and an exception taken to the ruling by which it was made, the defendant is estopped from taking advantage of it either by reason of having caused it to be made or by reason of having acquiesced in it. In order to dispose of this question satisfactorily it will be necessary to set forth the proceedings leading up to this exception, which we will do with some comments as we proceed. The defendant called as a witness Dr. Judd, who had been one of the plaintiff's physicians at the hospital and had treated him subsequently for the neuritis, and after examining him as to the injuries resulting from the accident proceeded to examine him in regard to the neuritis, when the following proceedings occurred, as set forth on pages 201-206 of the transcript:

"Q.   Have you attended him more recently?

A.   Yes sir.

Q.   What for?

A.   Peripheral neuritis of the right arm.

Q.   What was that?

Mr. Dunne.   We do not see how that is material.

Mr. Withington.   You put it in the testimony.

Mr. Dunne.   I don't understand that to be his testimony. I don't want to let that statement go unchallenged.

The Court.   Well, there was testimony in regard to his arm.

Mr. Dunne.   No, the complaint does not allege, as I recall it, that feature, any such feature as that.   If it came in it came in incidentally.   It was mentioned but we are not claiming that the neuritis was a necessary consequence of the accident.

The Court.   You claim nothing then for—?

Mr. Dunne.   To put it strictly and accurately we do not claim that the accident was the proximate and immediate cause of the neuritis.   No sir, we stand upon the general proposition, general case.   We make no special claim on account of neuritis."

(At this stage the jury might have found either that leaving the iron works was due principally to the neuritis and that that was unconnected with the accident, or that it was due principally to the increased asthma and weakness of the back and that these were connected with the accident.   The plaintiff, seeing the danger to him that the jury might find the former, sought to avoid it not only by preventing the introduction of further evidence in that direction but also by having withdrawn from the jury the evidence already introduced as to the neuritis so as to require the jury to find that leaving the iron works was due solely to the injuries resulting from the accident.   The defendant thereupon, taking the position that the evidence showed clearly that leaving the iron works was due to the neuritis alone, moved to strike out both the evidence in regard to leaving the iron works and that in regard to the neuritis, as follows:)

"Mr. Withington.   Then I move to strike out all the testimony in regard to his having to leave the Honolulu Iron Works and the cause of his leaving, because that testimony is indissolubly connected with that.   He said that he left—described:  He

said 'My tools dropped from my hands. I could not pick them up. I felt as if my hand would burst. The vein was swollen down. It went down to my fingers,' and that he was treated for it."

(Whereupon the plaintiff attempted by a proposition, if not a motion, to limit the defendant's motion to the evidence in regard to the neuritis alone and entice the defendant into thinking that that was sufficient for its purposes and into making that its own motion, as follows:)

"MR. DUNNE. It can be readily stated, it seems to me, that such evidence as the plaintiff may have given concerning the condition of his right arm in that particular respect, we have no objection to its being stricken out on the defendant's motion, but—"

(But the defendant did not accept the proposed modification of its motion and adhered to its original motion by stating:)

"MR. WITHINGTON. I want to strike out *all* the testimony in regard to *that.*"

(This statement is somewhat ambiguous, the plaintiff contending that "that" refers to his own last preceding statement relating to the neuritis alone, the defendant contending that it referred to its own last preceding statement relating both to leaving the iron works and to the neuritis. The latter evidently was intended, as shown more clearly by what followed, although it may not have been so understood by the plaintiff or the court. The plaintiff apparently adhered to his proposition that only the evidence as to the neuritis should go out, for he said:)

"MR. DUNNE. But we do not for a moment concede that if his tools dropped from his hands because he was weak, because his back was so weakened—"

(But the court may have thought with the defendant—a thought induced by the statements of the plaintiff, and which the court showed it already had when it remarked "you claim nothing then for—"—that the jury were merely to disregard the neuritis as an element of damages in itself and still be free to say whether leaving the iron works was due to the lame back and increased asthma or to the neuritis, for it said:)

"The Court. That will be a matter for the jury to determine.

Mr. Dunne. That he couldn't lift heavy weights, say.

The Court. I understand that. The court is ready to rule. Gentlemen, you will disregard all of the testimony given by the plaintiff with regard to his arm,—whatever disability or affection that may have had."

(This statement of the court is ambiguous. If it had stopped with the word "arm," it might mean that the jury were to disregard the evidence as to the neuritis for all purposes and still consider the evidence as to leaving the iron works in connection with the evidence as to weakness of the back, but it may have been intended to be limited by the subsequent words so as to mean that the jury were not only to disregard the evidence as to the neuritis as an element of damages in itself but also to disregard "whatever disability" to work resulted from the neuritis, thus leaving it to the jury to say whether leaving the iron works was due to the neuritis and, if they found that it was, to disregard the disability to work. The following statements, as well as some others set forth later, seem to indicate that the court and the defendant took the latter view:)

"Mr. Dunne. So far as he described that particular symptom.

The Court. So far as described, you will disregard that, the evidence in this case.

Mr. Withington. Well, now, I wish to ask the witness the same question, because I wish to show—

The Court. Ask your question.

(Question read)

Mr. Dunne. I suppose this testimony about the peripheral neuritis would go out of the case along with the other testimony.

Mr. Withington. I want to show that the cause of his having to leave the Honolulu Iron Works was peripheral neuritis and I want to show what the cause of it was and that it was in no way connected with this accident; that the cause of his leaving there had no connection at all with the accident."

(At this point the plaintiff, apparently seeing that his view was not taken, raised a new objection to the question asked the witness as follows,—his objection previously having been that there should be no further examination in regard to the neuritis

because he claimed no damages on that account, which objection was clearly unsustainable.)

"MR. DUNNE. We shall make no objection if any inquiry is made into the professional relations between Dr. Judd and his patient. Of course that objection will be made, but just now—"

(The plaintiff contends that this statement is erroneously punctuated, the correct punctuation according to him requiring a period after the word "objection" in the first line and a comma after the word "patient," which we think was probably what he meant, but apparently either the court did not think the new objection a good one or else the court and the defendant, as well as the stenographer, understood the statement to be as set forth in the transcript, as shown by the following statements:)

"THE COURT. Well now, proceed, gentlemen. Let's ask him.

MR. WITHINGTON. I have asked the question.

MR. DUNNE. I would like to take a ruling on that matter. This neuritis proposition having been eliminated I submit that this ought.to go out also, upon the same ground, and want to make—

THE COURT. Well, if the defendant can show that he was unable to perform his duties from some cause other than the alleged injury, why I think they have a right to do so. The objection will be overruled.

MR. DUNNE. Exception by plaintiff.

THE COURT. That ruling, however, is made with the understanding that the defendant is seeking to show that he was unable to perform his duties from some cause other than the alleged injury.

MR. WITHINGTON. All that testimony in regard to his leaving the Honolulu Iron Works and all claim on that account is eliminated from the case, which is one thing, but I understand distinctly that that is not and we don't want to have a misunderstanding about that.

(Question read)"

(This statement shows that the defendant had begun to realize that there was a misunderstanding as to the status of the evidence and that he desired it to be made clear, whereupon the plaintiff, without the status of the evidence being cleared

up at that point, proceeded to set forth his new objection in unmistakable language as follows:)

"MR. DUNNE.   We object to that as incompetent, irrelevant and immaterial, and as an invasion of the confidential relations. which subsist between a physician and his patient, under Section 1953 of the Revised Laws, under which neither a physician, an attorney or a minister of the Gospel is permitted to. disclose confidential matters, and in particular any information which the physician may have acquired in attending the patient. And if they want to prove those things they must prove them by someone other than the plaintiff's physician.

(Last two or three questions and answers read)"

(The court apparently looked upon this as a new move but. may not have understood it fully and did not rule until the plaintiff had gone back to his first objection based on his disclaimer of damages on account of the neuritis, whereupon the court sustained the objection, correctly so far as the new ground of objection was concerned, although not as to the old ground,. which seemed all along to appeal to the court, and of course the defendant had no ground for exception and did not except. This appears from the following:)

"THE COURT.   Do I understand you to object to the whole question?

MR. DUNNE.   Yes, sir, and moreover we are not claiming. anything on account of this neuritis.   We are not asking this jury to give him anything on account of the neuritis, which appeared in December.

THE COURT.   I think the objection is well taken.   The objection will be sustained.

MR. WITHINGTON.   I don't intend to except to your Honor's. ruling.   I don't understand—

THE COURT.   Objection sustained, Mr. Withington, and there is absolutely nothing before the court now."

(The following, however, took place.   The defendant resumed its effort to ascertain definitely the state of the record and stated clearly what its understanding had been, namely, that the jury were to disregard the evidence in regard to the neuritis. merely as an element of damages and were to consider all the evidence for the purpose of determining whether leaving the iron works was due to the neuritis or to the injuries resulting.

from the accident. The plaintiff also stated definitely that he had moved that the evidence as to the neuritis alone be struck out without attempting to put this off as the defendant's motion. The court stated substantially that the jury were to disregard the evidence as to the neuritis for all purposes, thus leaving the jury no other course than to find that leaving the iron works was due solely to the injuries resulting from the accident, whereupon the defendant excepted.)

"MR. WITHINGTON. I am trying to clearly ascertain the record before determining whether I will dismiss Dr. Judd. As I understand your Honor, no testimony has been stricken out but the jury have been instructed to disregard any damages from the peripheral neuritis and the injury to the hand?

THE COURT. I didn't .put it that way.

MR. DUNNE. We have asked that that matter be eliminated from the record, be stricken out.

THE COURT. The court instructed the jury to disregard all the testimony of the plaintiff regarding his arm. I don't remember just how he put it,—at any rate he testified that it was swollen, at times felt as if it might burst,—various other matters, whatever they may be the jury will entirely disregard all of the plaintiff's testimony concerning his arm.

MR. WITHINGTON. Well, then, I desire to except to the ruling because I think we have a right to have the evidence in for the purpose of showing that he received—"

(The following colloquy then occurred between the court and the defendant as to what each had understood, in which the reported words of the defendant, "I didn't move," is probably, as the defendant contends, an error for "I only moved," although the plaintiff contends otherwise and the court may have understood otherwise.)

"THE COURT. Why, you moved to strike it out.

MR. WITHINGTON. I didn't move to strike out all the evidence.

THE COURT. The court has granted your motion.

MR. WITHINGTON. No, you granted my motion in part. I except to the ruling of the court as it now stands, because the court has only granted a. part and left it standing that he left there because he couldn't work. Now I want the whole or none.

THE COURT. That is for the jury to say, whether or not he was forced to leave there, because he was unable to work, not for the court to say. It will stand as passed upon.

MR. WITHINGTON. That's all, doctor."

The court properly denied the defendant's motion to strike out the evidence in regard to leaving the iron works and the neuritis together, for the plaintiff was entitled to have the whole evidence go to the jury on the question as to how far leaving the iron works was due to the increased asthma and weakness of the back resulting from the accident. The court erred in granting the plaintiff's proposition or motion to strike out the evidence as to the neuritis alone, for the defendant had a right to have that go to the jury on the question as to how far leaving the iron works was due to the neuritis and not to the injuries resulting from the accident. The defendant took an exception to this ruling. This exception was taken as soon as the defendant understood what the ruling was, and that was while the particular matter was still before the court, that is, without any intervening proceedings. No doubt the defendant was somewhat to blame for its indefiniteness of statement and perhaps it should have understood better the position of the court and of opposing counsel, but we can hardly go so far as to say that it actually induced or acquiesced in the error. If that were so, we should not set aside the verdict. On the other hand, while the particular proceedings that led up to the exception were introduced by the defendant and its motion was properly overruled, the error that was committed was induced immediately by the plaintiff and consisted in a granting of the plaintiff's proposition or motion, and both the plaintiff and the court were, like the defendant, somewhat indefinite in their language and misunderstood each other and the defendant, quite as much as the defendant misunderstood them. On the whole, considering that prejudicial error was committed, that it was induced by the plaintiff, that the defendant excepted to the ruling as soon as it understood what it was and without any intervening proceedings, and that the language of all parties was indefinite, and that there were misunderstandings all around up to the

time the exception was taken, the defendant ought to have the benefit of the exception.

On the fácts as the jury found them the plaintiff was entitled to a verdict for very substantial damages. The error committed by the ruling of the court could affect only the amount of the verdict. If the error were one of excessive damages, we should give the plaintiff the privilege of avoiding a new trial by remitting a portion of the damages. But to do that when the error consisted in striking out evidence that should have gone to the jury would be to deprive the defendant of its right to have the jury pass on the amount of damages upon the proper evidence. We think, however, that, in view of the part that the defendant took in the proceedings leading up to the error, the setting aside of the verdict and granting of a new trial should be conditioned on its paying all costs to date irrespective of the final outcome of the case, and it is so ordered.

*J. J. Dunne* and *E. A. Douthitt* for plaintiff.

*Castle & Withington* for defendant.